IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **PURSHE KAPLAN STERLING INVESTMENTS, INC.**, <br><br> Plaintiff, <br><br> v. <br><br> **JEFF THOMSEN**, individually and as trustee of the JEFFREY THOMSEN REV TRUST UA 11/23/04 and the CAROL MARIE THOMSEN TRUST UA 6/2/14; and **CAROL THOMSEN**, individually and as trustee of the JEFFREY THOMSEN REVE TRUST UA 11/23/04 and the CAROL MARIE THOMSEN TRUST UA 6/2/14, <br><br> Defendants. | **MEMORANDUM DECISION AFTER A BENCH TRIAL: FINDINGS OF FACT AND CONCLUSIONS OF LAW** <br><br><br> Case No. 2:24-CV-00002-JNP <br><br> District Judge Jill N. Parrish |

Jeff and Carol Thomsen recently initiated FINRA Dispute Resolution Services Arbitration Number 23-03389, *Jeff Thomsen and Carol Thomsen vs. Purshe Kaplan Sterling Investments*, alleging claims in their individual capacities and their capacities as trustees against Purshe Kaplan Sterling Investments ("PKS"). PKS insists that the Thomsens' claims are not arbitrable and therefore filed this suit, seeking a declaratory judgment as to the non-arbitrability of the Thomsens' claims and an order restraining and enjoining the Thomsens from pursuing claims against PKS in the FINRA arbitration. For the reasons stated herein, the court concludes and finds that the Thomsens are "customers" within the meaning of FINRA Rule 12200 and that the Thomsens' claims against PKS are consequently arbitrable under that Rule.

**FINDINGS OF FACT**

*Parties*

Jeff and Carol Thomsen are individuals who reside in Draper, Utah. The Thomsens are

married and have three trusts between them. First, the Thomsens are co-trustees in the Carol Marie Thomsen Trust ("Carol's Trust"). Ex. No. 272, at 1.[1] Second, the Thomsens are similarly co-trustees in the Jeffrey B. Thomsen Trust ("Jeffrey's Trust"). Ex. No. 273, at 1. The trust agreements for Carol's Trust and Jeffrey's Trust were both executed on June 2, 2024. Ex. Nos. 272, at 1; 273, at 1. Third, Carol Thomsen is a co-trustee with two of the Thomsen's children in the Thomsen Family Dynasty Trust, which became effective on August 26, 2021. Ex. No. 8.

PKS is a broker/dealer and financial services firm with its principal place of business in Albany, New York. PKS is registered with the Securities and Exchange Commission and is a FINRA member.

### *The Thomsens' Relationship with PKS*

The Thomsens have no direct relationship with PKS. Neither the Thomsens nor any of their trust entities opened an account with PKS. PKS never provided financial advice or any other services to the Thomsens, whether individually or in their capacities as trustees. The Thomsens' only relationship with PKS is through their relationship with Adam Nugent ("Mr. Nugent"), a former representative of PKS.

### *PKS's Relationship with Mr. Nugent*

Mr. Nugent was PKS's registered representative between March 22, 2017 and June 21, 2018. ECF No. 40, ¶ 15. However, Mr. Nugent never opened a PKS account on behalf of any of his clients. Mr. Nugent never sold securities or otherwise transacted any business with or through PKS during his time as PKS's registered representative. It is undisputed that Mr. Nugent's only reason for registering with PKS was to become eligible to collect trail commissions on his past

---

[1] The court cites to the various exhibits by their exhibit numbers, noting that Plaintiff filed Exhibits Nos. 1–16 and Defendants filed Exhibits Nos. 201–273.

sales.

As a result of Mr. Nugent's registration as PKS's representative, PKS was required to "exercise appropriate supervision" over Mr. Nugent's activities "in order to prevent violations of the securities laws." FINRA Notice to Members 01-79: NASD Reminds Members of Their Responsibilities Regarding Private Securities Transactions Involving Notes and Other Securities and Outside Business Activities. To comply with this obligation, PKS began recording copies of all of Mr. Nugent's emails, including those regarding his activities as the Thomsens' investment advisor.

On March 1, 2018, Mr. Nugent emailed PKS's compliance team to request to discuss "a REG D we are looking to do through our RIA." Ex. No. 233, at 7. When Mr. Nugent wrote "REG D," he was likely referring to a potential private placement in which he would offer his clients the opportunity to invest in a privately held company or private fund. PKS's Compliance Officer responded to Mr. Nugent, informing him that he was "not permitted to do a Reg D private placement . . . unless it is sold through and would be custodied at your normal RIA Custodian[,]" which was TD Ameritrade. Ex. No. 233, at 6. "Otherwise[,]" the email continued, "this would constitute selling away from PKS and would not be permitted." *Id.* Following this email exchange, PKS's compliance team contacted Mr. Nugent on three separate occasions to request additional information about any potential Reg D private placement and other facts relevant to PKS's compliance obligations. *Id.* at 1–5. Mr. Nugent failed to provide the requested information. *Id.* at 1. On June 21, 2018, Mr. Nugent abruptly ended his affiliation with PKS. Ex. No. 237.

*The Thomsens' Relationship with Mr. Nugent*

Until recently, Mr. Nugent was the Thomsens' primary financial advisor. Mr. Nugent began providing the Thomsens with investment advice sometime in 2014. At all relevant times,

3

Mr. Nugent operated his own registered advisory firm, Foresight Wealth Management, LLC ("Foresight"). ECF No. 40, ¶ 16. The Thomsens met with Mr. Nugent periodically to discuss various investment opportunities and other matters related to their wealth management and financial planning. These meetings often took place in person at Mr. Nugent's office or the Thomsens' offices. When the Thomsens decided to make an investment based upon Mr. Nugent's advice, the Thomsens would write a check, which Mr. Nugent would personally pick up from the Thomsens.

In or around the middle of 2017, Mr. Nugent advised the Thomsens of an investment opportunity in a company called Agronomic, which conducted business in the cannabis industry. Mr. Nugent told the Thomsens that Agronomic would invest money in growing cannabis crops in the American West before using the output to manufacture and sell CBD products, including CBD oil. As they usually did, the Thomsens took Mr. Nugent's investment advice. The Thomsens initially invested $500,000 in the Agronomic business. *See* Ex. No. 16, at 1. In exchange for their investment, Agronomic Capital, LP sold the Thomsens a Convertible Promissory Note under which interest would accrue on the Thomsens' investment at a rate of 25% per annum. Ex. No. 1, at 2. Upon Mr. Nugent's advice, the Thomsens executed the Agronomic promissory note in the name of Carol's Trust. *Id.* at 6. The Thomsens paid Agronomic $500,000 with a check from their joint personal bank account. *See* Ex. No. 16, at 1. As he usually did, Mr. Nugent personally picked up the Thomsens' check.

At the time that Mr. Nugent advised the Thomsens to invest in Agronomic, Mr. Nugent represented only that this was a lucrative investment into which he was also investing some funds. Mr. Nugent failed to disclose to the Thomsens that he was personally involved in the ownership or operation of Agronomic. But Mr. Nugent did sign the Agronomic promissory note on

4

Agronomic's behalf, signing his name as the "MGR" of Agronomic Capital, LP, Agronomic Holdings, LLC, and Agronomic Enterprises, LLC. Ex. No. 14, at 6. Mr. Nugent also visited the Thomsens in person to pick up the $500,000 check that Mrs. Thomsen wrote to Agronomic Capital (although this was standard fare in Mr. Nugent's conduct as the Thomsens' financial advisor). Despite all of this, the Thomsens were not aware of Mr. Nugent's personal involvement in Agronomic's operations and understood only that he would be investing in the business alongside the money that they invested.

Mr. Nugent solicited and received the Thomsens' initial $500,000 investment in Agronomic while he was PKS's registered representative. After Mr. Nugent terminated his relationship with PKS, the Thomsens invested at least an additional $410,000 in Agronomic upon Mr. Nugent's advice. Ex. No. 16, at 2–3. These further investments were made through a $160,000 check written in September 2018 and a $250,000 check written in January 2019. *Id.* The Thomsens' third investment was induced by an email Mr. Nugent sent to the Thomsens on January 9, 2019, providing an update on their Agronomic investment. Ex. No. 239, at 1. In later communications providing updates on this investment, Mr. Nugent represented to the Thomsens that they had contributed $1,000,376 into Agronomic Capital, which had allegedly appreciated to a valuation of $1,500,564 by June 31, 2019. Ex. No. 243, at 19.

On February 27, 2023, the Securities and Exchange Commission issued an order instituting administrative and cease-and-desist proceedings against Mr. Nugent and Foresight. Ex. No. 248. According to the order, Mr. Nugent raised roughly $19.5 million from over eighty investors through offerings in Agronomic Capital between March and December 2018. *Id.* at 2. The SEC concluded that Mr. Nugent and Foresight had defrauded Agronomic Capital and its investors by "misusing certain fund assets, failing to disclose conflicts of interests, misrepresenting to investors

5

in Ag Capital how the proceeds of their investment would be used, and breaching Ag Capital's limited partnership agreement." *Id.*

**CONCLUSIONS OF LAW**

Arbitrability is a matter of agreement. *Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 977 (10th Cir. 2014) ("Everyone knows the Federal Arbitration Act favors arbitration. But before the Act's heavy hand in favor of arbitration swings into play, the parties themselves must *agree* to have their disputes arbitrated."). The parties have not entered any contract requiring arbitration. Yet neither party disputes that FINRA Rule 12200 "serves as a sufficient agreement to arbitrate, binding [FINRA] members to arbitrate a variety of claims with third-party claimants."[2] *See, e.g., Sparks v. Saxon Invs., LLC*, No. 2:09-CV-151-DAK, 2009 U.S. Dist. LEXIS 79184, at *8–9 (D. Utah Sept. 2, 2009).[3]

As a FINRA member, PKS is therefore deemed to have agreed to arbitrate claims when three conditions are met:

- Arbitration under the Code is either:
    (1) Required by a written agreement, or
    (2) Requested by the customer;
- The dispute is between a customer and a member or associated person of a member; and
- The dispute arises in connection with the business activities of the member or the associated person[.]

FINRA Rule 12200. Because this Rule constitutes an *agreement* to arbitrate, ordinary principles of state contract law govern its interpretation. *See AT&T Mobility LLC v. Concepcion*, 563 U.S.

---

[2] This principle has been broadly accepted in other circuits. *See, e.g., John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48, 58–59 (2d Cir. 2001); V*estax Secs. Corp. v. McWood*, 280 F.3d 1078, 1081 (6th Cir. 2002); *MONY Secs. Corp. v. Bornstein*, 390 F.3d 1340, 1342 (11th Cir. 2004) (quoting *Multi-Financial Secs. Corp. v. King*, 386 F.3d 1364, 1366 (11th Cir. 2004)).
[3] Many cases on this topic, including Judge Kimball's decision in *Sparks*, refer to provisions of the National Association of Securities Dealers ("NASD"), the predecessor to FINRA. The court applies these precedents in recognition of the fact that FINRA's Rule 12200 contains the same language as that formerly written in the NASD Code.

333, 339 (2011) (internal citations and quotation marks omitted); *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 176 (2d Cir. 2003) ("We have rules that interpretation of the NASD arbitration provision is a matter of contract interpretation, that New York law applies, and that the provision should thus be interpreted 'to give effect to the parties' intent as expressed by the plain language of the provision.'") (quoting *John Hancock*, 254 F.3d at 58).[4]

Applying the foregoing legal principles, the court determines that PKS is required to arbitrate the Thomsens' claims. Specifically, the court concludes and finds that 1) the Thomsens are "customers" under FINRA Rule 12200; 2) the dispute is between a customer and a FINRA member or its associated person; and 3) the dispute arises in connection with the business activities of the member or the associated person. As a result, the court finds that the Thomsens' claims are arbitrable pursuant to FINRA Rule 12200.

### I.     THE THOMSENS ARE CUSTOMERS FOR PURPOSES OF THE FINRA RULES

First, the court must determine whether a "customer" requested arbitration, which is the first element of the test to compel arbitration under FINRA Rule 12200. PKS insists that the Thomsens are not customers, and that as a result, PKS cannot be required to arbitrate disputes at the Thomsens' request. PKS's primary contention is that in order to qualify as a "customer" under the FINRA Rules, an individual must have some direct relationship with a FINRA member itself,

---

[4] Under either New York law or Utah law, the court would give effect to the plain language of FINRA Rule 12200 as a matter of contract law. *See John Hancock*, 254 F.3d at 58; *see also* The Tenth Circuit has not defined the term "customer" in the context of FINRA Rule 12200 or that Rule's predecessor in the NASD Code. In determining whether the Thomsens were "customers" for purposes of determining the arbitrability of their claims, the court therefore begins with the plain language of the Rule. *See Roberts v. Cent. Refrigerated Serv.*, 27 F. Supp. 3d 1256, 1259 (D. Utah 2014) (quoting *Reed v. Davis County Sch. Dist.*, 892 P.2d 1063, 1064–65 (Utah App. 1995)) ("In interpreting the arbitration agreement, the court looks first to the document itself. When a written contract's language is not ambiguous, the parties' intent 'must be determined from the words of the agreement.'"); *see also Peterson & Simpson v. IHC Health Servs.*, 2009 UT 54, *13, 217 P.3d 716 ("As with any contract, we determine what the parties have agreed upon by looking first to the plain language within the four corners of the document. When interpreting the plain language, we look for a reading that harmonizes the provisions and avoids rendering any provision meaningless.").

as opposed to merely making investments through or on the advice of the member's associated person. PKS asserts that the primary factor that precludes arbitration of the Thomsens' claims is that the Thomsens lacked any direct relationship with PKS. The court finds that PKS is mistaken, its position being contrary to the plain language of FINRA Rule 12200 and undermined by the weight of authority on this question.

### A. NO DIRECT INVESTOR-MEMBER RELATIONSHIP IS REQUIRED BY THE PLAIN LANGUAGE OF FINRA RULE 12200

FINRA Rule 12100(k) defines "customer" in incredibly broad terms, providing only that "[a] customer shall not include a broker or dealer." Moreover, nothing in the FINRA Rules requires (or even suggests) that a "customer" must have a direct relationship with a FINRA member. *See John Hancock Life Ins.*, 254 F.3d at 59. The Rule's "clear and unambiguous choice to leave the term as defined generally immediately leads to the conclusion that [the Thomsens] satisf[y] the 'customer' requirement" due to their purchase of investment assets from Mr. Nugent because they are neither brokers nor dealers, notwithstanding their lack of any direct customer relationship with PKS. *See King*, 386 F.3d at 1368. "Enforcing the limitation" that an investor must have a direct relationship with a FINRA member to be a "customer" for the purposes of Rule 12200 "would be tantamount to reading language into the [Rule] that is conspicuously absent." *Id.*

The conclusion that FINRA Rule 12200 does not require a customer to have a direct relationship with a FINRA member is further strengthened by FINRA's decision to impose a requirement of a direct member-investor relationship when defining the therm "customer" in other sections of its Rules. *Compare* FINRA Rule 0160(b)(4) ("The term 'customer' shall not include a broker or dealer.") and FINRA Rule 13100(i) ("A customer shall not include a broker or dealer.") *with* FINRA Rule 1250(b)(1) ("'Customer' shall mean any natural person and any organization, other than a broker or dealer, executing securities transactions with or through or receiving

8

investment banking services from a member.") and FINRA Rule 2261(c) ("[T]he term 'customer' means any person who, in the regular course of [a] member's business, has cash or securities in the possession of [that] member."). FINRA could have chosen to require a direct relationship between an investor and a FINRA member in order to deem that investor a "customer" for purposes of FINRA Rule 12200. But it did not do so. As a result, the plain language of FINRA Rules 12100(k) and 12200 supports the conclusion that the Thomsens are "customers" for the purposes of these Rules.

> B. **PERSUASIVE AUTHORITY SUPPORTS THE CONCLUSION THAT A CUSTOMER RELATIONSHIP DOES NOT REQUIRE DIRECT CONTACT BETWEEN AN INVESTOR AND FINRA MEMBER**

Absent Tenth Circuit precedent interpreting FINRA Rule 12200, the court is persuaded by the majority of the circuit courts of appeals, which have held that an investor is a customer under the FINRA Rules by conducting business with the member's associated person, notwithstanding the lack of any direct relationship with the FINRA member itself.

In *Oppenheimer*, the Second Circuit rejected a broker-dealer's allegation that an investor could not require a FINRA member to arbitrate unless the investor had opened a valid account with the broker-dealer. *Oppenheimber & Co. v. Neidhardt*, 56 F.3d 352, 357 (2d Cir. 1995) ("Having turned over their funds to Oppenheimer's representative so as to become customers of Oppenheimer, the Claimants did not lose the legal benefits of customer status because Oppenheimer's representative fraudulently established their account in a manner designed to conceal and defeat their interest."). Six years later, the Second Circuit revisited this question in *John Hancock Life Ins. Co.*, in which the court noted that "most of the decisions . . . contain language that supports a broad interpretation of the term 'customer.'" *John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48, 60 (2d Cir. 2001). In that case, an independent investment broker,

9

registered to represent a FINRA member, fraudulently sold promissory notes to investors, who were customers of the independent broker, but not of the member. *Id.* at 51. The FINRA member had no direct relationship with the investors, the investors were not apprised of the independent broker's affiliation with the member, and the member was not aware of the fraudulent promissory notes that the independent broker sold to the investors. *Id.* The Second Circuit held that the plain language of the Rule foreclosed the broker-dealer's argument that "[i]nvestors must be customers of [the FINRA member] and not merely of an associated person." *Id.* at 59. The Second Circuit therefore affirmed the district court's order granting the investors' motion to compel arbitration. *Id.* at 61.

Other circuit courts of appeals have found the Second Circuit's decisions on this issue persuasive. The Sixth Circuit, for example, has held that FINRA Rule 12200's "unambiguous text" compels the conclusion that a customer relationship sufficient to compel arbitration requires only a relationship between the purported customer and a member's associated person. *Vestax Sec. Corp. v. McWood*, 280 F.3d 1078, 1082 (6th Cir. 2002) (citing *John Hancock*, 24 F.3d at 58–59; *Oppenheimer*, 56 F.3d at 352; *Lehman Brothers Inc. v. Certified Reporting Co.*, 939 F. Supp. 1333 (N.D. Illinois 1996)). Similarly, the Fifth and Seventh Circuits have found certain claims subject to arbitration in part on the basis that a customer relationship under the FINRA Rules may arise as a result of an investor's relationship with either the FINRA member *or* its associated person. *See California Fina Group, Inc. v. Herrin*, 379 F.3d 311, 318 (5th Cir. 2004); *Miller v. Flume*, 139 F.3d 1130, 1135–36 (7th Cir. 1998).

Similarly, the Eleventh Circuit has repeatedly held that a customer under FINRA Rule 12200 may be a customer of either the FINRA member or of its associated person. In *King*, an investor lost her entire investment when an independent broker associated with a FINRA member

10

allegedly sold unregistered securities. *Multi-Financial Sec., Corp. v. King*. 386 F.3d 1364, 1365 (11th Cir. 2004). In contrast to the present case, however, the investor in that case was aware of the registered representative's affiliation with the FINRA member, and "relied, at least in part," on that affiliation in making the investments at issue. *Id.* Despite this fact distinguishing the instant dispute, the Eleventh Circuit's reasoning is directly applicable here: the FINRA Rules define "customer" to mean "anyone who is not a broker or dealer[,]" and "nothing in the [Rules] directs otherwise or requires more"; enforcing a limitation such as the requirement that a customer must be an investor with a direct relationship with the FINRA member "would be tantamount to reading language into the Code that is conspicuously absent." *Id.* at 1368. The *King* court noted that its holding "finds support in almost every other decision on this issue." *Id.* at 1368–69 (collecting cases). The Eleventh Circuit also noted, however, that some courts had reached decisions to the contrary. *Id.* at 1369–70 (citing *Investors Capital Corp. v. Brown*, 145 F. Supp. 2d 1302 (M.D. Fla. 2001); *Mony Secs. Corp. v. Vasquez*, 238 F. Supp. 2d 1304, 1306-08 (M.D. Fla. 2002)). "The reasoning of these decisions is not persuasive, however," the court concluded, "because they read a limitation into the Code that is absent from its language." *Id.* at 1369. This court already arrived at the same conclusion, finding that the plain language of FINRA Rule 12200 would not permit PKS's preferred interpretation, which would read into the Rule a conspicuously absent requirement that the would-be customer possess some direct relationship to the FINRA member.

Not all courts have been unanimous in interpreting FINRA Rule 12200. In *Orchard Securities, LLC v. Pavel*, for example, another judge on this court interpreted "customer" under that rule more narrowly. No. 2:13-CV-00389-RJS, 2013 U.S. Dist. LEXIS 111188 (D. Utah Aug. 6, 2013). The *Orchard Securities* court took caution not to disrupt the reasonable expectations of FINRA members in determining how broadly to interpret members' agreement to arbitrate under

11

the FINRA Rules. *Id.* at *7–8 (citing *Zarecor v. Morgan Keegan & Co., Inc.*, 2011 U.S. Dist. LEXIS 130700, 2011 WL 5592861, at *5 (E.D. Ark. July 29, 2011)). But that opinion overlooked the opinions of the Second, Fourth, Fifth, Sixth, and Eleventh Circuits, all of which had determined related issues the opposite way. Of course, none of those opinions, which the court discussed above, are binding on this court. But the court finds their near-unanimity on this issue persuasive. Moreover, while the *Orchard Securities* decision relied on a significant number of district court cases in which judges have narrowly construed FINRA Rule 12200, it could not point to more than three circuit court opinions that supported its reasoning—and each of those circuit court opinions are distinguishable from the present case.

*Orchard Securities* cites two Eighth Circuit cases for the proposition that investors are not customers of broker-dealer firms that did not provide the investors with investment or brokerage-related services. *See Orchard Securities LLC*, 2013 U.S. Dist. LEXIS 111188, at *9–10 (citing *Berthel Fisher & Co. Financial Services, Inc. v. Larmon*, 695 F.3d 749, 753 (8th Cir. 2012); *Fleet Boston Robertson Stephens, Inc. v. Innovex, Inc.*, 264 F.3d 770, 772 (8th Cir. 2001)). In *Fleet Boston*, the investor seeking to compel arbitration "only received financial advice, without receiving investment or brokerage related services[.]" 264 F.3d at 773. And in *Berthel Fisher*, a group of limited liability companies sold private placements of securities to a group of investors, with a FINRA member firm merely operating to review the private placement memoranda and serve as an intermediary for the financial transaction. 695 F.3d at 751. The Eighth Circuit distinguished *Oppenheimer* and *Vestax* in these cases on account of the fact that in those out-of-circuit precedents, "[t]he investors . . . purchased securities from associated persons of the firm." *Id.* at 753 (citing *Vestax*, 280 F.3d at 1081–82).[5] In both *Orchard Securities* and the instant dispute,

---

[5] *See also Raymond James Fin. Servs. v. Cary*, 709 F.3d 382 (4th Cir. 2013) (holding that an investor was not a customer for purposes of FINRA Rule 12200 when the investor merely purchased securities directly from a motor

12

the investor (here, Carol's Trust) purchased securities through and at the recommendation of a FINRA member's associated person, distinguishing *Berthel Fisher* and *Fleet Boston*.[6] The court therefore respectfully disagrees with *Orchard Securities* court's conclusion that arbitration could not be compelled on the foregoing facts. This court finds *Oppenheimer*, *Vestax*, and *King* to be relevant and persuasive authorities. The court applies the same reasoning employed in those cases here, finding the result to be that the Thomsens are customers for the purposes of FINRA Rule 12200 notwithstanding their lack of a direct relationship with PKS.

Though neither party relied upon such authority, the court also finds that the Fourth Circuit has narrowly read the definition of "customer" in FINRA Rule 12200. *See UBS Fin. Servs. v. Carilion Clinic*, 706 F.3d 319, 327 (4th Cir. 2013) ("In short, we conclude that 'customer,' as that term is used in the FINRA Rules, refers to one, not a broker or a dealer, who purchases commodities or services from a FINRA member in the course of the member's business activities insofar as those activities are regulated by FINRA—namely investment banking and securities business activities."). Of course, the court could simply dismiss this out-of-court precedent in favor of the standard set in the Second, Sixth, and Eleventh Circuits. But *Carilion* is also distinguishable from the present case. In that case, the entity seeking to arbitrate was a non-profit healthcare organization that sought to issue bonds to raise capital. A FINRA member provided advice regarding how to structure the auctioned bonds, underwrote those bonds, and was the lead broker-dealer for the bond auctions. *Id.* at 321–22. The court found the non-profit entity's claims were not

---

vehicle financing company upon the advice of a FINRA member's registered representative). The Fourth Circuit's decision in *Raymond James* is distinguish for the same reason that the Eighth Circuit's decisions in *Berthel Fisher* and *Fleet Boston* are distinguishable: through Carol's Trust, the Thomsens bought securities in Agronomic both through *and* on the advice of PKS's associated person, Mr. Nugent.

[6] The Convertible Promissory Note (Ex. No. 14, at 2) likely does constitute a security. *See Reves v. Ernst & Young*, 49 U.S. 56, 65, 68–69 (1990) (holding that all notes are presumptively securities, particularly when the note constitutes an "investment," unless that presumption is disproven through a four-factor analysis).

13

arbitrable because that entity did not purchase commodities or services from the FINRA member in a manner "covered by FINRA's regulation, namely, the activities of investment banking and the securities business." *Id.* at 325. In the present case, by contrast, PKS's associated person provided investment advisory services and broker-dealer services related to the claims at issue, which arise out of Mr. Nugent's sale of securities to the Thomsens while he was PKS's registered representative. Even considering *Carilion*'s precedent, the court finds little reason to question its conclusion that the Thomsens were customers for purposes of FINRA Rule 12200.

### C. THE AGRONOMIC INVESTMENT IS SUCCIFICIENT TO DEMONSTRATE THAT THE THOMSENS ARE CUSTOMERS

Having concluded that no direct investor-member relationship is required in order to establish a "customer" relationship under FINRA Rule 12200, the court turns to the question of whether PKS met its burden to show that the Thomsens are not "customers," either individually or in their capacities as trustees. The court finds that PKS has not done so.

The Thomsens' claim to be "customers" of PKS or its associated person for purposes of FINRA Rule 12200 arises out of their purchase of securities in Agronomic upon Mr. Nugent's advice. The court finds that Mr. Nugent recommended that the Thomsens consider investing in Agronomic, drafted the Convertible Promissory Note that effectuated the investment, told the Thomsens to make the investment in the name of Carol's Trust, and personally picked up the Thomsens' personal check written in the amount of $500,000 to Agronomic. The Thomsens were not aware that Mr. Nugent was an owner or operator of Agronomic, but instead understood him to be a co-investor in the business with the Thomsens. When they made the Agronomic investment, the Thomsens believed that the purchase of securities was no different than any other investment opportunity that Mr. Nugent had presented to the Thomsens over the years. Notwithstanding the Thomsens' understanding, Mr. Nugent was an owner or operator of Agronomic. At the same time,

14

Mr. Nugent marketed and sold the investment to the Thomsens in his capacity as the Thomsens' investment advisor, and the investment occurred at the same time that Mr. Nugent was PKS's registered representative (although PKS was not involved in the investment or any other transaction involving the Thomsens). In its brief and at trial, PKS made several arguments contending that the Thomsens cannot be customers under FINRA Rule 12200 based on the foregoing facts.

First, PKS notes that Carol's Trust purchased securities in Agronomic through the Convertible Promissory Note. Ex. No. 14, at 2. Because the undisputed evidence is that Carol's Trust did not have an account with Foresight, PKS insists that this fact shows that the investment cannot confer customer status on the Thomsens.[7] In support, PKS relies upon *Wachovia Sec., LLC v. Raifman*, No. C 10-04573 SBA, 2010 WL 4502360 (N.D. Cal. Nov. 1, 2010). The court finds *Raifman* factually similar to the present dispute, albeit with one critical distinction: the investors in *Raifman* sought to compel arbitration exclusively in their individual capacities, whereas in the instant case, the Thomsens amended their statement of claim to seek arbitration between PKS and the Thomsens individually and in their capacities as trustees for Carol's Trust and Jeffrey's Trust. The critical facts in *Raifman*, such as the individual investor's lack of a direct relationship with the FINRA member's registered representative, are therefore not persuasive in this case. Instead, the court finds that the fact that Carol's Trust effectuated the Convertible Promissory Note to be inconclusive evidence that the Thomsens are not customers under FINRA Rule 12200.

Second, PKS argues that because the Thomsens produced only investment advisory agreements with Foresight, but no agreements directly with Mr. Nugent, the court should conclude

---

[7] The facts established at trial demonstrate that the Thomsens are each co-trustees of both Carol's Trust and Jeffrey's Trust. The court therefore finds no reason to believe that an investment made by Carol's Trust would foreclose the Thomsens' ability to request arbitration, individually or in the alternative in their capacities as trustees.

15

that the Thomsens could be at most customers of Foresight, but not of PKS or its associated person Mr. Nugent. The court finds this line of argument unpersuasive. The undisputed evidence at trial showed that Mr. Nugent was the Thomsens' long-time financial advisor. The Thomsens opened accounts at Foresight upon Mr. Nugent's advice. Also upon his advice, the Thomsens did not open an account in the name of Carol's Trust. Yet the Thomsens made the Agronomic investment in the name of Carol's Trust because Mr. Nugent instructed them to in his capacity as financial advisor. The court concludes that such a technicality as the fact that Carol's Trust did not possess an account with Foresight could not possibly foreclose the Thomsens from being customers in their individual capacity or their capacity as trustees when the Thomsens purchased securities in the name of Carol's Trust upon the advice of their financial advisor while he was PKS's registered representative.

Third, PKS argues that because the Thomsens wrote two additional checks for further investments in Agronomic after Mr. Nugent disassociated himself with PKS, the Agronomic investment cannot form the basis for the Thomsens' customer status. This fact does not alter the court's conclusion for two reasons. First, it is undisputed that the Thomsens wrote Agronomic the first check for their Agronomic investment while Mr. Nugent was still registered with PKS. And PKS presented no evidence to demonstrate that this first check would not be sufficient standing alone to confer customer status onto the Thomsens. Second, the plain language of the FINRA Rules provides that "a person formerly associated with a member *is* a person associated with a member." FINRA Rule 12100(w). When the Thomsens wrote two later checks for additional investments, Mr. Nugent was therefore still PKS's associated person—because he was formerly PKS's associated person. Thus, the court concludes that the later-written checks do not show that the Thomsens did not become customers when they wrote checks to invest in Agronomic on Mr.

16

Nugent's advice.

Finally, PKS argues that Mr. Nugent never transacted or conducted any business through PKS, but instead was likely only registered as PKS's representative in order to collect trail commissions. On this alternative basis, PKS again asserts that the Thomsens could not be customers of PKS or its associated person because Mr. Nugent's relationship with PKS was too attenuated for him to be PKS's associated person. Under the FINRA Rules, the terms "associated person" and "person associated with a member" share a definition. *See* FINRA Rule 12100(b) ("The term 'associated person' or 'associated person of a member' means a person associated with that member, as that term is defined in paragraph (w)."). And under that definition, an individual is a FINRA member's associated person if he or she is "[a] natural person who is registered or has applied for registration under the Rules of FINRA[.]" FINRA Rule 12100(w)(1). PKS presented no evidence to show that Mr. Nugent was not registered as PKS's representative under the Rules of FINRA between March 22, 2017 and June 21, 2018. The undisputed evidence shows the opposite. ECF No. 40, ¶ 15. The court thus finds that under the plain language of FINRA Rule 12110(w), Mr. Nugent was PKS's registered representative (and therefore a person associated with a FINRA member). PKS's argument regarding *why* Mr. Nugent may have chosen to register with PKS under the Rules of FINRA is thus irrelevant to the question of whether the Thomsens are customers under the FINRA Rules.

As a result of the foregoing, the court concludes and finds that the Thomsens, individually or in their capacity as trustees, are "customers" for purposes of FINRA Rule 12200. Because the Thomsens requested to arbitrate their claims against PKS, the court finds that the first element of arbitrability under the Rules is satisfied. The court now proceeds to consider the second and third elements, which require the court to determine whether 2) the dispute is between a customer and

17

a FINRA member or its associated person and 3) the dispute arises in connection with the business activities of the member or the associated person.

## II. THE DISPUTE IS BETWEEN A CUSTOMER AND A FINRA MEMBER OR ITS ASSOCIATED PERSON

The second element of the test for arbitrability under FINRA Rule 12200 is whether the "dispute is between a customer and a member or associated person of a member[.]" FINRA Rule 12200. PKS does not meaningfully dispute that this element has been met. Instead, the parties seem to agree that so long as the Thomsens are "customers," the dispute to be arbitrated—meaning the Thomsens' claims against PKS—is between a customer and a member or an associated person of a member. The court concludes and finds that the second element of the test for arbitrability under FINRA Rule 12200 is satisfied, the dispute being between a customer and a FINRA member.

## III. THE DISPUTE ARISES IN CONNECTION WITH THE BUSINESS ACTIVITIES OF THE MEMBER OR THE ASSOCIATED PERSON

The final element of the test for arbitrability under FINRA Rule 12200 is whether the "dispute arises in connection with the business activities of the member or the associated person[.]" FINRA Rule 12200. PKS insists that this element is not satisfied because it believes that Mr. Nugent's sale of the Agronomic investment to the Thomsens fell beyond his traditional role as an investment advisor, such that the transaction did not occur within the business activities of either PKS or Mr. Nugent.

Lacking Tenth Circuit precedent on this issue, the court again looks to other circuits' precedents for guidance in interpreting Rule 12200. In *King*, for example, the Eleventh Circuit addressed a set of facts that is similar to the one at issue here. In that case, the investor alleged a cause of action for negligent supervision against a FINRA member after the member's registered representative sold unregistered securities to the investor. 386 F.3d at 1365–66. The Eleventh

18

Circuit found that claims arising out of a FINRA member's supervision of its associated persons necessarily arises out of or in connection with the member's business because a member's business requires it to engage in supervision of its associated persons. *Id.* at 1370 (citing *Vestax*, 280 F.3d at 1082; *John Hancock*, 254 F.3d at 58–59); *see also* 1 Thomas H. Oehmke, Commercial Arbitration § 28:14 (2003) ("A dispute that arises from a securities brokerage firm's lack of supervision over its brokers arises in connection with its business (for purposes of NASD rules compelling arbitration of disputes).").

The distinction between *King* and the present case is that Mr. Nugent not only allegedly sold unregistered securities but sold securities to the clients of his investment advisory practice in a business in which he possessed undisclosed ownership or control. PKS argues that this fact should distinguish *King*, leading the court to conclude that Mr. Nugent's sale of the Agronomic investment to the Thomsens fell beyond the bounds of his investment advisory role. Some facts support that argument. The Agronomic investment was not made through the Thomsens' accounts with Foresight. Moreover, Mr. Nugent advised the Thomsens to make the investment through Carol's Trust, although the Thomsens paid Agronomic through their personal joint bank account. The issue, however, is that Mr. Nugent *represented* that he was recommending the Agronomic investment in his capacity as the Thomsens' financial advisor. In fact, that is the basis of the Thomsens' claim—that while Mr. Nugent was PKS's registered representative, he sold the Thomsens an investment in a business as if he was acting in his usual capacity as their investment advisor while he possessed an undisclosed ownership in or operational control of Agronomic. The fact that Mr. Nugent is alleged to have misrepresented those facts to the Thomsens, then, cannot preclude arbitration. To conclude otherwise would require the court to alter Rule 12200, which provides for arbitration not only for disputes that arise out of a FINRA member's associated

19

person's business activities but also for disputes that arise "in connection with" those business activities. FINRA Rule 12200. Mr. Nugent's alleged misrepresentation does not alter the fact that the Thomsens' allegations of negligent representation and other claims arose in connection with Mr. Nugent's business activities as the Thomsens' investment advisor or PKS's business activities, which include supervising the firm's associated persons. The court therefore concludes that the third element of FINRA Rule 12200 is satisfied, the claims to be arbitrated arising in connection with the business activities of PKS or its associated person Mr. Nugent.

## CONCLUSION AND ORDER

The court concludes and finds as follows:

1. The Thomsens are customers for purposes of FINRA Rule 12200.

2. The Thomsens have requested to arbitrate their claims against PKS.

3. The dispute is between a customer and a FINRA member or associated person of a member.

4. The dispute arises in connection with the business activities of the FINRA member or its associated person.

5. PKS is obligated to arbitrate the Thomsens' claims against it in FINRA Dispute Resolution Services Arbitration Number 23-03389, *Jeff Thomsen and Carol Thomsen vs. Purshe Kaplan Sterling Investments*.

6. PKS is not entitled to attorney fees or costs for this litigation.

Signed March 26, 2024

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge